FILED

03/22/2017

Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs January 4, 2017

## IN RE ASHTON V.

### Appeal from the Juvenile Court for Sumner County
### No. 2010JV926      Barry R. Brown, Judge

_____

### No. M2016-00842-COA-R3-JV

_____

This appeal arises from a juvenile court's modification of a primary residential parent designation. The mother appeals the juvenile court's findings that a material change in circumstance had occurred and that a change in the primary residential parent was in the child's best interest. The mother also challenges the juvenile court's denial of her Rule 60.01 motion. Upon review, we conclude that the juvenile court erred in relying on a report that was not entered into evidence at the hearing, but the error was harmless. Even excluding the report, the evidence does not preponderate against the juvenile court's findings that a material change in circumstance had occurred and that modification of the primary residential parent designation was in the child's best interest. We further conclude that the juvenile court did not abuse its discretion in denying the mother's Rule 60.01 motion.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and ARNOLD B. GOLDIN, JJ., joined.

Georgina K. Hughes, Mount Juliet, Tennessee, for the appellant, Laura S.

Laura A. Frost, Gallatin, Tennessee, for the appellee, Jeremy V.

**OPINION**

## I. FACTUAL AND PROCEDURAL BACKGROUND

Ashton V. was born in July 2010 to an unmarried couple, Laura S. ("Mother") and Jeremy V. ("Father"). By statute, in the absence of a custody order, custody of a child born out of wedlock is with the mother. Tenn. Code Ann. § 36-2-303 (2014). In January 2015, in response to Father's request for specific parenting time, the Juvenile Court[1] for Sumner County, Tennessee, entered an order naming Mother primary residential parent and granting Father parenting time every other weekend. Subsequently, the court granted Father additional parenting time on Wednesdays.[2]

On September 9, 2015, Father filed a petition seeking a change in the primary residential parent designation. He alleged a material change in circumstances had occurred in that Mother was uncooperative and confrontational, unwilling to foster his relationship with Ashton, and attempting to alienate Ashton from him.

### A. PROOF AT THE HEARING

1. Day One of Testimony

The court initially heard testimony on Father's modification petition on January 7, 2016. Both Mother and Father testified as well as the paternal grandfather, the father of Mother's other child, and the fiancée of the other father.

At the time of the hearing, Father was working toward an associate's degree in criminal justice at Volunteer State Community College, with the ultimate goal of employment as a police officer. He lived with his girlfriend in Westmoreland, Tennessee. Father asked to be named primary residential parent with Mother having parenting time every other weekend and three non-consecutive weeks in the summer. He maintained that, if he were primary residential parent, he would be willing to foster a good relationship between Ashton and Mother.

According to Father, he filed his modification petition because of Mother's refusal to encourage his relationship with his son. He complained that, after the entry of the

---

[1] The juvenile court has authority to determine "any custody, visitation, support, education or other issues regarding the care and control of children born out of wedlock." Tenn. Code Ann. § 37-1-104 (Supp. 2016).

[2] The original custody order and the subsequent modification were not included in the record on appeal.

custody order, Mother would not communicate with him. Mother did not inform him about his son's school events or doctor appointments.

At the time of the hearing, Ashton was five and attended kindergarten in Gallatin, Tennessee, near Mother's home. Mother's work schedule prevented her from picking Ashton up from school because she worked until 8 p.m. five or six days each week. At Mother's request, Ashton's paternal grandparents often picked him up from school and cared for him until she finished work. According to Father, "if she knew I was going to be seeing him, she would hold him back" from his grandparents. Father claimed that Mother initially refused his offer to pick Ashton up after school himself. In addition, when Mother needed a caregiver for Ashton on weekends, she forced her other son's father to keep both children in an effort to keep Father away from Ashton. Father testified that Mother had violated the custody order with regard to his summer parenting time, and the court had found Mother in contempt.

Father told the court that Mother also made false accusations of abuse against him in an effort to damage his relationship with Ashton. Since the custody order was entered, Mother had reported Father to the police for abuse three times. She also reported him to DCS twice for suspected abuse. Neither the police nor DCS ever filed any charges against Father. According to Father, Ashton was present when the police arrived at his house in response to Mother's complaints.

Although Father agreed that he had a good relationship with his son, he testified that he was concerned that Mother's tactics were beginning to succeed. Ashton had recently been asking to return to Mother's house during Father's parenting time.

In addition to Mother's unwillingness to encourage his relationship with Ashton, Father claimed that Mother had exposed Ashton to domestic violence. In November 2014, Mother filed an assault report against Richard Smith, her then live-in boyfriend, and Mr. Smith was arrested. Ashton was in the home during the November incident. Despite the domestic violence, the couple married in January 2015.

In the fall of 2014, Ashton developed an involuntary tic. Father explained that he took Ashton to see a neurologist in April who determined that the tic was caused by stress. A letter from the neurologist confirmed that Ashton had developed a motor tic disorder. Because, at the time of the evaluation, his symptoms were decreasing, the doctor believed that the tic could be transient. Father claimed that the tic had worsened since Ashton's initial evaluation.

The neurologist recommended that Ashton see a counselor. Father claimed Mother delayed several months, and eventually, Father made the counseling appointment. At the time of the hearing, Ashton had been attending counseling sessions for approximately two months.

Father testified that Mother often delayed or failed to schedule necessary medical care for his son and tried to prevent him from being involved in Ashton's medical care. He claimed Mother became so uncooperative about making Ashton's appointments and sharing dates with him that he began making the appointments himself.

Father also expressed his concern about Ashton's current bedtime at Mother's house. At some point, Mother had agreed that Father could pick Ashton up after school. Father reported that Ashton complained of being extremely tired after school and often took long naps. By contrast, when Ashton spent weekends with Father, he had a set schedule and a proper bedtime.

On cross-examination, Father conceded that since September 2015 he had received all of the parenting time to which he was entitled under the current custody order. He admitted that Mother allowed him additional parenting time after school. However, Father pointed out that in the week before the hearing, Mother had enrolled Ashton in after school day care, eliminating Father's additional time.

Father agreed that Ashton had a strong bond with both parents. Other than the occasional sickness and the nervous tic, Ashton was healthy and did well in school.

The paternal grandfather testified about the loving bond between Father and Ashton. He agreed that Mother often asked the grandparents to keep Ashton instead of Father. He explained that, when Ashton was at the grandparents' house, Mother would call to inquire who was there.

The court also heard testimony from Brian Baker, the father of Mother's other child, and his fiancée, Kimberly Meyers. Mr. Baker testified that Mother had threatened to keep him from spending time with his own son if he did not agree to care for Ashton at the same time. Mr. Baker acquiesced to her demands because "it's her way or no way."

Ms. Meyers confirmed that the couple had cared for Ashton at least five weekends in 2015. She explained that she refused Mother's request that she keep Ashton after school because she knew Father was willing to do it. Ms. Meyers also told the court that she had witnessed Mother make disparaging remarks about Father in front of Ashton.

Ms. Meyers provided additional testimony about Mother's relationship with her husband, Mr. Smith. According to Ms. Meyers, Mr. Smith moved into Mother's home in the summer of 2014. Mother had confided to her that Mr. Smith had an alcohol and drug problem and was often violent towards her. The couple married in January 2015, but the relationship was over by April. Subsequently, Ms. Meyers discovered that Mr. Smith had a police record for domestic assault.

4

For her part, Mother claimed that she always encouraged a good relationship between Father and Ashton. While she may have made some disparaging remarks about Father in conversations with Mr. Baker and Ms. Meyers, she denied she ever made any negative comments about Father in Ashton's presence. She maintained that she notified Father of all doctor appointments and invited him to school events. She even offered Father additional parenting time after school in an effort to encourage his relationship with Ashton. According to Mother, the previous contempt finding was due to Father's lack of cooperation, not hers.

Mother denied Ashton was stressed. She claimed that Ashton's tic was a result of near-sightedness. According to Mother, after she bought glasses for Ashton, his tic disappeared.

Mother admitted that she worked four or five days per week until 8:30 p.m. Her workload had recently increased due to a co-worker's promotion. She also worked every other Saturday but claimed she tried to work on those Saturdays when the children were with their fathers. She denied threatening Mr. Baker with less parenting time if he did not agree to keep Ashton. She claimed that she only asked Mr. Baker to keep Ashton on a few Saturdays while she was working. She explained that she did not ask Father because he always demanded to keep Ashton overnight.

Mother claimed that her abuse reports were motivated by legitimate concerns for Ashton's safety. On one occasion, Father had been "hateful" and "rude" when he picked Ashton up for his visitation. Because she feared Father would hurt Ashton, she called the police to perform a welfare check. She conceded that the police investigation had revealed no cause for alarm. In December 2015, she took Ashton to the emergency room because he had returned from Father's house with bruises. The hospital personnel called DCS, not Mother. She denied that she had filed the other abuse reports.

Mother brushed off any concerns about her husband, Mr. Smith. She agreed that she had filed charges against Mr. Smith for domestic assault in September and November 2014 and then married him the following January. According to Mother, Mr. Smith suffered from PTSD. After receiving probation on the assault charges, he attended a rehabilitation program, quit drinking, and started counseling. Mother explained that she and Mr. Smith had been through a "rough patch" but were doing better now and had recently celebrated their one-year anniversary. She described Mr. Smith as "the best stepdad that I could ever ask for for my kids." She explained that Mr. Smith was only home a few days each week because he worked in Columbia, Tennessee. When working, he stayed at his mother's house in Columbia.

Because of the court's schedule, the hearing was adjourned at the end of Mother's testimony, and another hearing date was set for March 4, 2016. The court also

5

announced to the parties that CASA[3] would be involved in the case. On January 11, 2016, the juvenile court directed the CASA volunteer to investigate the welfare of the child and submit written findings and concerns to the court.

2. Day Two of Testimony

Between hearing dates, Father filed a petition to hold Mother in contempt for a new violation of the custody order. The court heard testimony on the modification petition and the contempt petition on March 4, 2016. The only new witness on the second day was Mr. Smith. Mother provided rebuttal testimony. Father's testimony was confined to his contempt allegations.[4]

Mr. Smith flatly contradicted Mother's previous testimony and claimed that his two-year relationship with Mother had ended in April of 2015. Eight months later, however, they reconnected, and he agreed to testify on her behalf. According to Mr. Smith, Mother wanted him to testify at the first hearing that they had an ongoing relationship because she thought it would help her.

Mr. Smith disclosed that the couple's reconciliation was short-lived. He moved in with Mother shortly before the last hearing, and after about two weeks, Mother asked him to leave because he was drinking again. Although he admitted that he told Mother he was planning to contact her sons' fathers and said, "Good luck, b****," he claimed that he was currently testifying as a neutral party.

Mr. Smith told the court that, during their relationship, he saw Mother yell at the children and yell at Father within Ashton's hearing. According to Mr. Smith, Mother spoke in a derogatory manner about both fathers. In his opinion, Mother's comments appeared to upset the children. He stated that he heard Mother tell Ashton directly that she did not want him to visit Father.

Mr. Smith described life in Mother's home as unorganized and chaotic. "There's never a set schedule for anything; so it's fly by the seat of your pants." He agreed that their frequent arguments added to the chaos. He testified that Ashton was nervous and

---

[3] CASA is an acronym for Court Appointed Special Advocate(s). CASA volunteers are "specially trained community volunteers who are available to be appointed by the courts to advocate on behalf of abused and neglected children in judicial proceedings." *In re Audrey S.*, 182 S.W.3d 838, 854 n.9 (Tenn. Ct. App. 2005). The juvenile court may appoint a CASA volunteer to "conduct such investigation and make such reports and recommendations pertaining to the welfare of a child as the court may order or direct." Tenn. Code Ann. § 37-1-149(b) (2014).

[4] Father testified that Mother had denied him his parenting time on a Wednesday afternoon. He conceded that Mother offered him a different day as a substitute.

stressed much of the time. He attributed Ashton's nervousness to his chaotic environment.

Mr. Smith admitted that he had a history of alcohol abuse and had completed a rehabilitation program. He also confirmed that he had assaulted Mother in the fall of 2014 and that Ashton had been home at the time.

He further testified that during their relationship he and Mother had "done pain pills" off and on and tried methamphetamine in February or March of 2015. He claimed that Ashton was home when they used the illegal drug. He also claimed that Mother occasionally abused prescription drugs and drank alcohol when the children were home.

On rebuttal, Mother denied Mr. Smith's claims. She testified that she asked Mr. Smith to move out in April 2015 and January 2016 because of his drinking. She claimed that Mr. Smith was angry with her and was lying to get revenge.

Mother denied any drug use and offered to take a drug screen. Of her own accord, Mother offered the results of a negative drug screen she had obtained from a private drug testing facility in December 2015. Mother also denied ever yelling at Father or her children. She claimed that she and Father never raised their voices around the children.

## B. FINAL ORDER OF CUSTODY

On April 12, 2016, the juvenile court entered a final custody order. The court determined that a material change of circumstance had occurred justifying a change in the primary residential parent. The court further determined that modification of custody was in the best interest of the child.

Accordingly, the court entered a new permanent parenting plan, naming Father as the primary residential parent and granting Mother 120 days of parenting time to be exercised every other weekend and alternating Sunday nights. The parents would also alternate weeks during summer vacation. The court ordered Mother to pay $95 per month in child support.

On June 20, 2016, Mother filed a motion, pursuant to Rule 60.01 of the Tennessee Rules of Civil Procedure, requesting that the court correct alleged errors in its final order. The juvenile court denied Mother's motion. In a separate order, the court also denied Father's second contempt petition.

## II. ANALYSIS

On appeal, Mother challenges the juvenile court's finding of a material change in circumstances and that modification of the primary residential parent was in the child's

best interest.  She also argues that the juvenile court abused its discretion in denying her Rule 60 motion.

## A. STANDARD OF REVIEW

We review the trial court's factual findings de novo on the record, with a presumption of correctness, unless the evidence preponderates otherwise.  Tenn. R. App. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692-93 (Tenn. 2013).  "Because '[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during . . . proceedings themselves,' appellate courts 'are reluctant to second-guess a trial court's decisions.'"  *In re Alexandra J. D.*, No. E2009-00459-COA-R3-JV, 2010 WL 5093862, at *3 (Tenn. Ct. App. Dec. 10, 2010) (quoting *Johnson v. Johnson*, 165 S.W.3d 640, 645 (Tenn. Ct. App. 2004)).  We review the trial court's conclusions of law de novo with no presumption of correctness.  Tenn. R. App. P. 13(d).  We give great deference to the trial court's findings with regard to credibility of witnesses, *In re Alexandra J. D.*, 2010 WL 5093862, at *3, and we will not overturn such findings absent clear and convincing evidence to the contrary.  *See Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014).

## B. MODIFICATION OF THE CUSTODY ORDER

Adjudicating disputes over who should be designated the primary residential parent is one of a court's greatest responsibilities.  *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007).  Because circumstances change in unanticipated ways, courts are statutorily empowered to modify a primary residential parent designation.  *See* Tenn. Code Ann. § 36-6-101(a)(1) (Supp. 2016) (A decree naming a primary residential parent for a minor child "shall remain within the control of the court and be subject to such changes or modification as the exigencies of the case may require.").

Tennessee courts apply a two-step analysis to requests for either a modification of the primary residential parent or the residential parenting schedule.  *See, e.g.*, *In re T.R.Y.*, No. M2012-01343-COA-R3-JV, 2014 WL 586046, at *11-12 (Tenn. Ct. App. Feb. 12, 2014) (primary residential parent modification); *In re C.R.D.*, No. M2005-02376-COA-R3-JV, 2007 WL 2491821, at *6 (Tenn. Ct. App. Sept. 4, 2007) (parenting time modification).  The threshold issue is whether a material change in circumstance has occurred since the court adopted the current parenting plan.  Tenn. Code Ann. § 36-6-101(a)(2)(B).  Only if a material change in circumstance has occurred do we consider whether a modification to the current parenting plan would be in the child's best interest by examining the statutory best interest factors.  *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003).

8

1. Material Change in Circumstance

In the context of a modification of custody, also known as a change in the primary residential parent, a material change in circumstance may "include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child." Tenn. Code Ann. § 36-6-101(a)(2)(B). Although there are "no hard and fast rules" for determining when a material change in circumstance has occurred, factors for our consideration include: (1) whether the change occurred after entry of the order sought to be modified; (2) whether the change was known or reasonably anticipated when the order was entered; and (3) whether the change affects the child's well-being in a meaningful way. *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002). Not every change in circumstance is a material change; "[t]he change must be significant before it will be considered material." *In re T.C.D.*, 261 S.W.3d 734, 744 (Tenn. Ct. App. 2007).

The "determination of whether a material change of circumstances has occurred" is a question of fact. *Armbrister*, 414 S.W.3d at 692. The parent seeking a modification has the burden of proving a material change by a preponderance of the evidence. Tenn. Code Ann. § 36-6-101(a)(2).

The juvenile court found that Father had proven a material change of circumstance sufficient to modify custody based on a number of factual findings:

> The Court finds the Mother made derogatory comments about the Father in the presence of the child evidencing combative and hostile co-parenting. Father testified that the combative nature of their interaction intensified after being granted specific parenting time by the Court in January 2015.
>
> The Father testified that he is the party that is providing the bulk of the care for the minor child. The Mother's job requires her to be at work until 8:00 p.m. at least five nights per week. Through the week, the Father picks up the child from school at 2:30 p.m. and keeps the child until the Mother is off work at 8:00 p.m.
>
> The CASA report submitted to the Court finds that the Mother's work schedule is too taxing on the minor child and not in his best interest.

Further the Court finds the child has been involved in domestic violence episodes while in the Mother's care between the Mother and her husband:

Additionally, the Court finds the Mother has been involved with illegal drugs and abuse of prescription drugs while the minor child has been in her care.

Conversely, the Father is a student at VolState. He has a loving nurturing home and is interested in the child's best interest. He is concerned about the lack of physical care, the emotional abuse and the chaos the child experiences with the Mother.

a. CASA Report

Initially, we address Mother's argument that the trial court improperly based its finding of a material change at least in part on the CASA report. While it is apparent from the court's final custody order that a CASA report was submitted to the court, the report was never admitted as an exhibit at the hearing or made a part of the technical record on appeal.

The Tennessee Rules of Evidence apply in all trials in Tennessee, including custody cases tried in juvenile court. Tenn. R. Evid. 101. In a bench trial, the court's judgment must be based on the evidence in the record or on matters of which it would be appropriate to take judicial notice. *Finney v. Finney*, 619 S.W.2d 130, 134 (Tenn. Ct. App. 1981), *overruled on other grounds by State ex rel. Cooper v. Hamilton*, 688 S.W.2d 821 (Tenn. 1985).

Because the CASA report was not admitted as an exhibit at trial, the court could only rely on the report if it took judicial notice of the facts in the report. "The result of taking judicial notice of a fact is the establishment of the admission of that fact into evidence." *Counts v. Bryan*, 182 S.W.3d 288, 291 (Tenn. Ct. App. 2005). Courts are authorized to take judicial notice of facts that are not subject to reasonable dispute in that they are either generally known within the area or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Tenn. R. Evid. 201(b). We conclude that the CASA report was not an appropriate subject for judicial notice. Therefore, the juvenile court improperly relied on the report as support for its finding of a material change.

Still, even if the CASA report is ignored, as discussed below, the evidence does not preponderate against the finding of a material change in circumstance sufficient to

10

modify custody. Therefore, we conclude that the court's improper reliance on the CASA report was harmless.

b. Evidence of a Material Change

Mother argues that Father failed to meet his burden of proof because the changes he alleged occurred before the entry of the custody order and the changes did not affect Ashton in a meaningful way. We disagree. After a thorough review of the record, and giving due consideration to the juvenile court's credibility findings, we conclude the evidence does not preponderate against the finding of a material change sufficient to change the primary residential parent.

This custody case, like many others, hinges on hotly disputed factual issues. Father and his witnesses described a series of events that he claims were material changes. For her part, Mother either denied the allegations or tried to justify her actions. As this Court has recently explained, "[w]hen the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016). Thus, we give great weight to the lower court's credibility determinations. *Id.* (citing *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997)). The juvenile court credited Father's testimony over Mother's, and we find no basis in this record to disturb that finding on appeal.

Although Father received his allotted parenting time after September 2015, Mother violated the custody order with regard to his summer parenting time, initially refused to allow him to care for Ashton when she was working, and tried to exclude him from Ashton's medical care and school activities. Mother only granted Father additional time with Ashton after Ms. Meyers and the paternal grandparents refused to accommodate her. When viewed in light of Mother's unfounded abuse reports and derogatory comments about Father, Mother's uncooperative behavior evidences an unwillingness to allow Father a role in Ashton's life. Maintaining and encouraging a relationship between the child and the non-custodial parent is important to the child's well-being. *Roache v. Bourisaw*, M2000-02651-COA-R3-CV, 2001 WL 1191379, at *6 (Tenn. Ct. App. Oct. 10, 2001). Even though Father had a good relationship with Ashton, the record reflects that Mother's behavior was affecting Ashton's attitude toward spending time with his father.

We recognize that the domestic abuse incidents described at the hearing occurred before the entry of the custody order. Still, Mother married a man that she had filed assault charges against twice. Thus, a convicted abuser lived in her home with Ashton for at least four months after the entry of the custody order. In addition, she allowed him to move in again in January 2016. Mother's relationship with Mr. Smith was a relevant

11

change to Ashton's home environment. *See In re T.C.D.*, 261 S.W.3d at 744. As we have stated before, exposure to domestic violence may certainly have a negative impact on a child. *McEvoy v. Brewer*, No. M2001-02054-COA-R3-CV, 2003 WL 22794521, *4 (Tenn. Ct. App., Nov. 25, 2003). We are particularly concerned that Mother appeared to find nothing harmful in repeatedly allowing Mr. Smith into her home and exposing Ashton to potential violence.

Mr. Smith testified that Mother abused prescription drugs and tried an illegal drug at least once when Ashton was in her home. Mother denied these allegations, but the court did not find her testimony credible. Mother contends that this record contains clear and convincing evidence that Mr. Smith lacked credibility. After a thorough review of this record, we do not find such clear and convincing evidence. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Mother relies on her own testimony that Mr. Smith was angry when she ended their relationship the second time and her claims that Mr. Smith would lie about her for revenge. While we agree that Mr. Smith could be biased, we cannot say that this record contains clear and convincing evidence that he lied in court. The only contradictory evidence was provided by Mother, and it is readily apparent from the record on appeal that Mother's testimony concerning her relationship with Mr. Smith was not truthful. Under these circumstances, we will not overturn the juvenile court's assessment of Mr. Smith's testimony.[5]

Mother also contends that the juvenile court erred in finding a material change in light of Father's admission that Ashton was healthy and doing well in school. Testimony at the hearing also established that Ashton developed a nervous tic, was undergoing counseling for stress, was excessively tired after school, and had begun to express a reluctance to visit Father. He was also exposed to domestic violence and possibly drug abuse. Thus, we conclude that the evidence does not preponderate against the court's finding that the changes affected Ashton in a meaningful way.

2. Best Interest Analysis

A material change of circumstance only permits the court to reexamine the original custody order in light of the child's best interest. *In re T.C.D.*, 261 S.W.3d at 746. The best interest analysis is a "particularly fact-intensive process." *McEvoy*, 2003 WL 22794521, at *5. Under the analysis, the trial court must determine which parent is "comparatively more fit than the other to be the custodial parent." *Id.* To aid in the

---

[5] Mother also claims that the juvenile court gave undue weight to Ms. Meyers's testimony because the witness had a working relationship with the judge's niece. Before Ms. Meyers testified, the court announced that, although she was known to the court, the court would treat her as impartially as any other witness. We find no indication in this record of bias.

consideration of the child's best interest, the Legislature directs that courts look to a non-exclusive list of statutory factors.[6]  Tenn. Code Ann. §§ 36-6-404(b), -405(a) (2014).

_____

[6] The court shall consider all relevant factors applicable to the case, including:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.  In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . . . ;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person.  The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. . . . ;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

The determination of where the best interests of the child lie is a factual question. *In re T.C.D.*, 261 S.W.3d at 742. As noted above, we review the trial court's factual findings de novo upon the record, with a presumption of correctness, unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d). Evidence preponderates against a trial court's factual finding when the evidence supports another factual finding with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005).

Mother argues the juvenile court erred in its best interest analysis by failing to conduct the comprehensive analysis directed by the statute. Mother's argument is unavailing. The juvenile court was not required to "list and discuss each factor[,]" and "the absence of an explicit discussion of each factor does not mean that they were not considered." *Keisling v. Keisling*, 196 S.W.3d 703, 723 (Tenn. Ct. App. 2005).

Here, the court explicitly referenced the statutory factors and focused on the factors it found most significant. The court found that Father was the parent most willing and able to encourage a close and continuing relationship between the child and both parents. The court also noted that the proof showed Father could provide a more stable home environment for Ashton. Based on the testimony, the court questioned Mother's moral, physical, mental, and emotional fitness to parent Ashton. Finally, the court determined that Mother's work schedule was not in the best interest of the child.[7]

Mother contends that the court failed to consider the strength and nature of her relationship with Ashton, their emotional ties, her status as his primary caregiver, his relationship with his half-brother, and the importance of continuity. We recognize that Ashton has a strong bond with both parents and has lived with Mother for all of his young life. Father, however, has indicated his willingness to support Ashton's relationship with Mother. While the factors Mother describes are undoubtedly important, we cannot discount the importance of other factors Mother did not mention: (1) Mother's unwillingness to encourage a positive relationship between Father and Ashton; (2) her drug use; (3) her relationship with a man who assaulted her twice; and (4) the adverse impact of Mother's work schedule since Ashton started school. At this critical point in

---

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106.

[7] Even without the CASA report, this record supports a finding that Mother's schedule was impacting Ashton. Mother admitted that she worked until 8:30 p.m. the majority of the days Ashton was in school. Father testified that he kept Ashton after school at his parents' house to minimize the travel distance and brought Ashton to Mother's home when she called, which was presumably after she finished work. It would be reasonable to conclude that Mother's work schedule was taxing on the child.

his young life, Ashton needs stability.  We agree with the juvenile court that Father is the parent with the greater ability to provide that stability.

## C.  RULE 60.01 MOTION

Finally, Mother argues that it was an abuse of discretion for the juvenile court to deny her Rule 60.01 motion because the court's final order does not accurately reflect the court's decision.  Rule 60.01[8] of the Tennessee Rules of Civil Procedure is designed to provide relief from clerical errors in a judgment or order.  *Cont'l Cas. Co. v. Smith*, 720 S.W.2d 48, 49 (Tenn. 1986).  Our Supreme Court has directed that application of the rule should strike a proper balance between the "competing principles of finality and justice." *Id.*

We review a trial court's decision to deny a Rule 60.01 motion under an abuse of discretion standard.  *Burke v. Huntsville NH Operations LLC*, 491 S.W.3d 683, 686 (Tenn. Ct. App. 2015).  A court abuses its discretion when it applies an incorrect legal standard, reaches an unreasonable result, or bases its decision on a clearly erroneous assessment of the evidence.  *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).  In reviewing the trial court's exercise of discretion, we presume that the decision is correct and review the evidence in a light most favorable to upholding the decision. *Lovlace v. Copley*, 418 S.W.3d 1, 16-17 (Tenn. 2013).

Mother claims that the court's final order does not accurately reflect the court's decision because it differs from the content of an email message sent by the court to the parties.  The court's email message was not included in the record on appeal.  Mother had a responsibility to provide a complete and accurate appellate record to enable this Court to review her issues on appeal.  *See* Tenn. R. App. P. 24; *see also Jennings v. Sewell-Allen Piggly Wiggly*, 173 S.W.3d 710, 713 (Tenn. 2005) (describing the duty of both parties to ensure a complete and accurate record on appeal).  When a party fails to provide the necessary record to consider an issue on appeal, we have deemed the issue waived.  *See Chiozza v. Chiozza*, 315 S.W.3d 482, 489 (Tenn. Ct. App. 2009); *Wells v. Illinois Cent. R. Co.*, No. W2010-01223-COA-R3-CV, 2011 WL 6777921, at *6 (Tenn. Ct. App. Dec. 22, 2011).

---

[8] Rule 60.01 provides in relevant part:

> Clerical mistakes in judgments, orders or other parts of the record, and errors therein arising from oversight or omissions, may be corrected by the court at any time on its own initiative or on motion of any party and after such notice, if any, as the court orders.

Tenn. R. Civ. P. 60.01.

15

Even if we were to consider Mother's issue, Rule 60.01 relief is designed to correct "facial errors arising from oversight or omission." *Cont'l Cas. Co.*, 720 S.W.2d at 49; *see also Jackman v. Jackman*, 373 S.W.3d 535, 542 (Tenn. Ct. App. 2011) ("Rule 60.01 'is intended to be used to correct errors in a judgment which cause the judgment to fail to reflect the court's ruling accurately,' whether those errors are 'inclusions, transpositions, or the leaving out of something the judge intended should go into the order.'" (citations omitted)). From the record before us, we cannot say that the juvenile court abused its discretion in denying Mother's motion. Assuming the court made an initial ruling in an email, the court also approved a final order submitted by Father's counsel that the court found accurately reflected its ruling. The court's final order was supported by the evidence, applied the proper legal standard, and did not reach an unreasonable result.

## III. CONCLUSION

We conclude that the juvenile court erred in relying on the CASA report. Nevertheless, even excluding the report, the evidence does not preponderate against the juvenile court's determination that a material change of circumstance occurred sufficient to modify custody. The evidence also does not preponderate against the finding that a change in the primary residential parent designation was in Ashton's best interest. We further conclude the juvenile court did not abuse its discretion in denying Mother's Rule 60.01 motion. Accordingly, we affirm.

_____
W. NEAL MCBRAYER, JUDGE